**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**SIERRA CLUB, INC.; FLORIDA PUBLIC
INTEREST RESEARCH GROUP
CITIZEN LOBBY, INC.; and
SAVE OUR SUWANNEE, INC.,**

       **Plaintiffs,**

**vs.**                           **CASE NO.  4:04-CV-120-SPM**

**MICHAEL O. LEAVITT, in his capacity as
Administrator of the United States
Environmental Protection Agency; JIMMY
PALMER, in his official capacity as
Regional Administrator of the United States
Environmental Protection Agency, Region
4; and the UNITED STATES ENVIRON-
MENTAL PROTECTION AGENCY,**

       **Defendants.**

_____/

**ORDER ON SUMMARY JUDGMENT**

     **THIS CAUSE** comes before the Court upon the cross-motions for

summary judgment filed by Plaintiffs (doc. 58) and Defendants (doc. 76), as well

as all supporting materials.  The Court has carefully reviewed the administrative

record certified to this Court by the parties (doc. 24) as well as those portions of

the supplemental record not objected to by Defendant EPA.

## FACTUAL BACKGROUND:

The Clean Water Act ("CWA") was enacted by Congress in order to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." Clean Water Act § 101(a), *codified at* 33 U.S.C. §§ 1251-1387. Among other things, it establishes the basic structure for regulating discharges of pollutants into the waters of the United States; gives the Environmental Protection Agency ("EPA") the authority to implement pollution control programs such as setting wastewater standards for industry; and requires states to set water quality standards for all contaminants in surface waters.

In particular, section 303(d)(1)(A) requires each state to identify and prioritize "impaired waters"—those waters for which technology-based effluent limitations are inadequate to attain water quality standards. These waters are interchangeably referred to as "impaired waters", "303(d) waters", or "Water Quality Limited Segments ("WQLS")". States must then establish Total Maximum Daily Loads ("TMDL's") for each impaired water. The TMDL is a calculation of the maximum amount of a pollutant that a waterbody can receive and still meet water quality standards. Once the 303(d) list is complete, it is submitted to the EPA for review. The EPA can approve a list in whole or in part, add waters it finds to be impaired, and remove ("delist") waters it finds to meet acceptable standards.

To that end, Florida passed the Watershed Restoration Act ("WRA") in 1999, which bestows upon the Florida Department of Environmental Protection

("FDEP") the power and duty to develop a comprehensive anti-pollution program and adopt rules by which to implement the WRA. § 403.061, *Fla. Stat.* (2004). Section 403.067(3)(b) requires the FDEP to establish a methodology to identify impaired waters that must be included on the 303(d) list.  In response, the "Impaired Waters Rule" ("IWR") was created and codified at Florida Administrative Code section 62-303.  The IWR evaluates whether waters are currently meeting their designated uses, which include aquatic life use support; primary contact and recreation use support; fish and shellfish consumption use support; and drinking water use support. Waters verified as not meeting any one (or more) of their designated uses are ultimately placed on the state's 303(d) list and assigned a TMDL.

The rule creates a "planning list" which contains waters to be further researched to determine whether they in fact fall short of water quality standards.[1]  Those that meet the planning list requirements <u>and</u> meet the additional requirements of Florida Administrative Code sections 62-303.420 through 62-303.480 are moved to the "verified list".[2] At that point, the FDEP establishes a TMDL schedule and prioritizes the impaired waters as high,

---

[1]  Waters are placed on the planning list if "the number of exceedances of an applicable water quality criterion due to pollutant discharges is greater than or equal to the number listed in [the appropriate table] for the given sample size." *Fla. Admin. Code* r. 62-303.300(1).

[2]  Florida Administrative Code sections 62-303.420 through 62-303.480 lay out criteria such as exceedances of aquatic life-based water quality criteria; biological impairment; toxicity; nutrient criteria; primary contact and recreation use; fish and shellfish consumption use; and drinking water use.

medium, or low, taking into account a number of factors.[3]  This verified list and

TMDL schedule are submitted to the EPA as Florida's 303(d) list.

In order to focus resources appropriately while implementing the WRA,

Florida created the rotating basin approach, dividing the state's waters into 5

basins, each containing about 20% of the watersheds in the state.  Each year,

FDEP concentrates its data collection and analysis on one basin.  Thus, while

Florida's 303(d) list for 2002 included impaired waters in all five basins, only

Group 1 waters (those in the first basin to be examined) had been revised.

The 2002 list was Florida's first submission which applied the IWR

methodology.  In its Decision Document, the EPA complimented Florida on its

excellent efforts, noting that over 2 million data points had been collected for

Group 1 alone and concluding that FDEP had been "very successful" at

identifying waters falling below applicable quality standards.  (AR 2.4 at 5)[4]  The

EPA did clarify, however, that because the IWP methodology was new and

untried, EPA did its own review of the data to determine whether Florida's 303(d)

list met the underlying state standards.  Ultimately, the EPA approved a number

of waters on that list; added its own waters; approved some delistings; and

disapproved 12 delistings.

---

[3]  Factors to be considered include "the severity of the impairment and the designated uses of the impairment, taking into account the most serious water quality problems; most valuable and threatened resources; and risk to human and aquatic life."  *Fla. Admin. Code. r. 62-303.500(1).*

[4]  Citations to the administrative record are denoted by a capital AR followed by the document number and relevant page number(s).

Plaintiffs filed a three-count suit against the EPA, claiming that 1) the EPA arbitrarily and capriciously approved Florida's 303(d) list because it failed to include numerous waters under fish consumption advisories due to mercury; 2) Florida's low priority for mercury-impaired waters violates the CWA's priority ranking requirements and is contrary to the evidence that was before the EPA; and 3) the EPA's approval of Florida's exclusion and delisting of certain other waters violates the CWA.  Plaintiffs and Defendants have now filed cross-motions for summary judgment, and both sides have submitted thoroughly-researched, well-written memoranda on the issues.

## STANDARD AND SCOPE OF REVIEW

Judicial review of agency actions to determine whether those actions were "arbitrary and capricious" is authorized by the Administrative Procedure Act, 5 U.S.C. § 702.  Perhaps the most-cited case explaining the "arbitrary and capricious" standard is Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co., 463 U.S. 29 (1983).  There, the United States Supreme Court emphasized that the standard is a narrow one and that a reviewing court is not to substitute its judgment for that of the agency.  Id. at 43.  The Court provided examples:

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Id.  The Eleventh Circuit has also recognized the "great deference" that must be

accorded agency decisions.  <u>South Georgia Natural Gas Co. v. F.E.R.C.</u>, 699

F.2d 1088 (11th Cir. 1983).  "'Administrative decisions should be set aside in this

context . . . only for substantial procedural or substantive reasons as mandated

by statute, . . . not simply because the court is unhappy with the result reached.'"

<u>North Buckhead Civic Ass'n v. Skinner</u>, 903 F.2d 1533, 1539 (11th Cir. 1990).

The key to this Court's review is reasonableness:  "As long as the agency's

interpretation is reasonable, a reviewing court cannot overrule it even though

other interpretations might strike the court as more reasonable."  <u>South Georgia</u>

<u>Natural Gas Co.</u>, 699 F.2d at 1090 (citations omitted).

Summary judgment is particularly appropriate when reviewing

administrative action.  10B *Charles Alan Wright & Arthur R. Miller, Federal*

*Practice and Procedure* § 2733 (3d ed. 1998).  Federal Rule of Civil Procedure

56(c) provides for entry of summary judgment "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  The moving party has

the burden of showing the absence of a genuine issue as to any material fact,

and in deciding whether the movant has met this burden, the court must view the

evidence and all factual inferences arising from it in the light most favorable to

the nonmoving party.  <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir.

1993).

The moving party may meet the burden by showing that the non-moving

party lacks evidence to support an essential element of the non-moving party's case.  See Riley v. Newton, 94 F.3d 632, 638-39 (11th Cir. 1996).  Once the burden is met, summary judgment cannot be avoided by the non-moving party by simply relying upon the allegations or denials in the pleadings.  See Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).  Rather, to avoid summary judgment, the non-moving party must point to evidence in the record or additional evidence that could be "sufficient to withstand a directed verdict motion at trial." Id. (citations omitted).  The basic inquiry by the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

The Rule 56 standard is not affected by the filing of cross motions for summary judgment: "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A *Wright & Miller*, *supra*, at § 2720 (3d ed.1998). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. Anderson v. Frederick J. Hanna & Assocs., 361 F. Supp. 2d 1379, 1382 (N.D. Ga. 2005)(*citing* United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir.1984)).

With the foregoing standards in mind, the Court now turns to each of the three counts alleged in the amended complaint.

## Count I

In Count I, Plaintiffs allege that the EPA was arbitrary and capricious in its approval of Florida's omission of waters that are currently under fish consumption advisories because of mercury.  There seems to be some confusion about the exact number of water bodies at issue.  Plaintiffs' amended complaint cites a total of 97 bodies: 53 waters that were only on Florida's planning list but should have been on the verified list; 20 that were delisted from the 1998 list because of information older than 7.5 years; and 24 lakes under a fish consumption advisory that were not on the verified list.  Plaintiffs' motion for summary judgment amends these numbers somewhat, acknowledging that of the 20 delisted due to outdated information, only 11 were actually on the 1998 list to begin with.  Eight fall into the same category as the 53 waters that Plaintiffs claim should have been added to the verified list.  The remaining water, Lower Suwannee River, does actually appear on the verified list, and Plaintiffs have withdrawn their claim as to that particular water.

Defendants point out that there are actually 25 lakes at issue, not 24 (two lakes, Dias and Dorr, were erroneously treated as a single body), and alleges that Plaintiffs have withdrawn their claim as to the 8 waters referred to above.  According to Defendants, there are only 89 waters at issue.

Having examined the record, the Court finds that there is a total of 97 waters involved in this case: 61 waters that were only on Florida's planning list

but should have been on the verified list;[5] 11 waters that were delisted from the 1998 list because of information older than 7.5 years;[6] and 25 lakes under fish consumption advisories.

## I.

Plaintiffs claim that 11 waters were delisted from the 1998 list because of information older than 7.5 years.  In EPA's Decision Document, Appendix L lists all waters in Florida's 303(d) list as of June 11, 2003, the date the decision was rendered.  That list clearly shows that all 11 are present.  Plaintiffs' claims as to these 11 lakes are without merit.

## II.

Plaintiffs next allege that certain mercury-impaired waters should have been placed on Florida's 303(d) list, and divides those waters into two groups (25 lakes and 61 waters) according to the sources of evidence demonstrating the presence of mercury.  As to the 25 lakes, Plaintiffs claim that they should have been listed[7] due to fish consumption advisories for mercury.  Because one lake, Deer Point, was actually on both the 1998 (AR 1.6 at 39) and 2002 lists (AR 2.4 at 154), only 24 lakes remain at issue.  Of the remaining lakes named by Plaintiff,

---

[5]  53 original waters plus the 8 which were moved from the other category of 20.  Contrary to Defendants' assertion that Plaintiffs withdrew their claim as to these 8 waters (doc. 78 at 15, n.5), Plaintiffs specified that the 8 should be placed in the same category as the 53 original waters (doc. 59 at 16).

[6]  20 original waters minus the 8 which were moved to the other category of 53, minus the 1 withdrawn by Plaintiffs (Lower Suwannee River).

[7]  Plaintiffs state that the lakes were improperly omitted from the 1998 303(d) list as well; however, the only question before this Court is the propriety of EPA's decisions as to the 2002 list.

13 are not in the Group 1 basin.[8]  As discussed in the background section of this order, Florida began utilizing a rotating basin approach to water management subsequent to its 303(d) submission in 1998.  Under the basin approach, FDEP updates its identification of impaired waters for one of the 5 basins every year.  In 2002, only Group 1 waters were scheduled for update.  Hence, the 1998 listing remains unchanged as to any waters in Groups 2 through 5.  Those groups are scheduled for updating in the next four years, one basin per year.

The EPA accepted this basin approach, noting in its Decision Document that it "allows the State to achieve maximum effectiveness from limited monitoring and assessment resources by concentrating specific functional activities in specific basins according to an established, multi-year schedule." (AR 2.4 at 10)  As discussed *supra*, lists for the waters in each remaining group will be submitted annually through 2007.  Thus, Plaintiffs' claims as to those lakes outside Group 1 will not be addressed.

In support of the claims regarding the remaining 11 lakes in Group 1, Plaintiffs point to the 2002-03 Florida Freshwater Sport Fishing Regulations, which list all mercury-tested freshwater bodies in Florida and their status. Plaintiffs assert that this listing in the Regulations necessitates a 303(d) listing.

### III.

Plaintiffs also allege that 61 waters currently under fish consumption advisories due to mercury were omitted from the verified list submitted to the

---

[8]  The non-Group 1 lakes and their basins are recited in doc. 78, p. 18, n.10.

EPA.  In support, Plaintiffs point to a column on Florida's "master list" which allegedly identifies waters under mercury advisories.  Plaintiffs assert that this column proves the need for those waters to be on the verified list.

Defendants explain in response that Plaintiffs misapprehend the purpose of the master list.  Florida's "master list" is the integrated report which the EPA encourages states to file to fulfill the requirements of sections 303(d) and 305(b) of the CWA.[9]  The planning and verified lists are two components of the master list.  The master list includes a column entitled "Parameters Assessed Using the Impaired Waters Rule" to indicate areas of concern for further investigation, some of which include mercury.  Defendants argue that Plaintiffs mistakenly interpret the word "mercury" in this column to mean that those waters are under an active fish consumption advisory.

## IV.

The gist of Plaintiffs' claim in Count I is that Defendants were well aware of the existence of mercury in Florida waters and yet ignored available data when making crucial decisions as to inclusion on and approval of the 303(d) list and priority for establishing TMDL's.  Pursuant to EPA regulations, all states must "assemble and evaluate all existing and readily available water quality-related data and information to develop the [required] list[s]."  40 C.F.R. § 130.7(b)(5).

_____

[9]  Previously, states submitted two separate reports, one pursuant to 303(d) and the other pursuant to 305(b), which requires a biennial accounting of the water quality of all waterbodies in the state.  However, on November 19, 2001, the EPA published its "2002 Integrated Water Quality Monitoring and Assessment Report Guidance," which encouraged states to file an integrated report to satisfy the collective requirements of sections 303(d) and 305(b).

While the state is not required to use all the data collected, it must provide a

rationale for their exclusion.  40 C.F.R. § 130.7(b)(6)(iii).  Judicial review of

Defendants' decisions, then, turns on an examination of the excluded data;

FDEP's reasons for not using them; and EPA's reasons for approving those

decisions.

Data Older Than 7.5 Years Old: The IWR prohibits FDEP from using data

"more than 7.5 years old at the time the water segment is proposed for listing on

the verified list." *Fla. Admin. Code* r. 62-303.400(2).  The Environmental

Regulation Commission (ERC)[10] added this requirement to the IWR for two main

reasons.  First, such a limitation is "consistent with the overall approach in the

IWR to make listing decisions based on data reflecting current conditions, and

second, Everglades data indicate that mercury accumulation has decreased

significantly in the past few years."  (AR 3.1, att. 6, p. 4) Importantly, the Fish and

Wildlife Commission has agreed to "prioritize monitoring of waters on the

planning list for mercury based on older fish advisories so that recent data will be

available when the Department prepares its verified list for the basin." Id.

Additionally, in FDEP's documentation included with its 2002 list, FDEP

explained that although data older than 7.5 years were considered not to be

representative of current water quality, they are not considered invalid.  FDEP

also noted that no such limitation exists for developing the planning list.  (AR 3.3

---

[10]  The ERC meets regularly and is responsible for approving rules which establish
environmental standards for FDEP to enforce.  *See* §§ 20.255(7) and 403.804(1), *Fla. Stat.*, *as
amended by* Chapter 95-295, Laws of Florida.

at 7)

In its Decision Document, the EPA first noted that because 2002 was

Florida's first year submitting a 303(d) list using the IWR, the EPA did not rely

solely on the IWR's methodology, instead reviewing the data itself whenever a

question arose as to the reasonableness of the methods used in the IWR.  The

EPA ultimately followed FDEP's lead in not reviewing data over 7.5 years old,

labeling FDEP's cutoff time "reasonable":

> EPA considered FDEP's robust data collection efforts in deciding
> not to rely on data older than 7.5 years, since older data can be
> less reliable in representing current conditions. Water quality may
> have changed during that time frame due to improvements in
> pollutant management strategies (point & nonpoint source),
> changes in population resulting in changes in land use, or
> hydromodification. Also sampling and analysis techniques have
> improved significantly, especially for certain metals analysis such
> as mercury, lead and cadmium, so reported results older than 7.5
> years may not provide reliable evidence of in-stream
> concentrations.

(AR 2.4 at 23)  The EPA was careful to note its efforts to ensure that enough

data existed within that timeframe to justify the cutoff.  (AR 2.4 at 30)

Fish Consumption Advisories:  The EPA provided a guidance document

(#WQSP-00-03) on October 24, 2000, explaining the role of fish consumption

advisories in determining attainment of water quality standards.  (AR 1.8)  While

acknowledging that such advisories do generally demonstrate water impairment,

the document warned of several reasons not to use them.  (AR 1.8 at 2)  The

EPA set forth guidelines for determining whether advisories constitute "all

existing and readily available data," which the CWA requires be examined in

compiling 303(d) lists.

The guidance document considers an advisory to be data that

demonstrate non-attainment of a section 101(a) "fishable" use when:

1.   the advisory is based on fish and shellfish tissue data;
2.   a lower-than-approved NSSP classification is based on
     water column and shellfish tissue data;
3.   the data are collected from the specific waterbody in
     question; and
4.   the risk assessment parameters (e.g., toxicity, risk level,
     exposure duration and consumption rate) of the advisory are
     cumulatively equal to or less protective than those in the
     state.

(AR 1.8 at 3)  However, the document then goes on to note that in some cases,

advisories do not necessarily demonstrate that a "fishable" use is not being

attained in an individual waterbody:

> For example, a State may have issued a statewide or regional
> warning regarding fish tissue contaminated with a bioaccumulative
> pollutant, based on data from a subset of waterbodies.  A State
> may use a higher fish consumption value in determining the need
> for an advisory compared to the value used in establishing water
> quality criteria for the protection of human health. . . . In such
> instances, . . . they need not be listed as impaired under section
> 303(d) unless there are waterbody-specific data (and the data were
> not considered during the development or review of a non-
> precautionary NSSP classification), showing non-attainment of
> section 101(a) uses.

(AR 1.8 at 4)  The EPA recommends that such waters be listed as "threatened"

on the 305(b) list.

In the Decision Document, the EPA compared this guidance to Florida's

methodology, which consisted of identifying "all waterbodies with posted

advisories, where there was [sic] waterbody specific fish tissue data collected

and analyzed within the past 7.5 years." (AR 2.4 at 41)  The EPA found that

when applied properly, FDEP's process of considering advisories is a reasonable

one for identifying impaired waters.

        2003 Florida Fish Consumption Advisories, FDEP (SAR Tab B):[11] In

particular, Plaintiff includes this 4-page document which explains that advisories

fall into three categories: No Consumption, Limited Consumption, and Follow

EPA Guidelines.  The latter two categories limit the amount of fish to be

consumed based on an individual's sex, age, and whether that individual is

pregnant or nursing.  The document contains four tables, three of which are

relevant to mercury levels.  Table 1 focuses on three particular species of fish

(largemouth bass, bowfin and gar).  "Limited Consumption" is recommended for

all Florida waters except for those listed in the table, which recommend either

"No Consumption" or "Follow EPA Guidelines".  Table 2 sets out

recommendations for freshwater fish species other than the three mentioned in

Table 1.  Finally, Table 3 lists advisories for marine fish consumption.  In all three

tables, either "Limited Consumption" or "Follow EPA Guidelines" is recommended

for all Florida waterbodies by default, with other restrictions as noted.

        In contrast, Defendants assert that certain fish consumption advisories

relied upon by Plaintiffs were rescinded.  The EPA's webpage includes a search

engine by which active and rescinded advisories can be located (no hard copy

---

        [11] Citations to the Supplement to the Administrative Record are denoted by a capital SAR followed by the relevant tab, document, or page number(s).

was provided of rescinded advisories by either side; instead, a reference was

made to this website).  A query of the webpage shows that advisories were

rescinded for 88 waters on December 31, 2002.  However, there is no link to any

of the rescinding documents; neither is there a reference to the rescinding

agency or the authority by which these advisories were rescinded.

Additionally, Plaintiffs and Defendants have agreed to the following facts:

Some or all of the 53 mercury waters listed above had specific
testing done on them, with the finding being that the fish were not
safe to eat. The State Department of Health publicized this at the
time. Three examples of this data, showing the number of tests, the waterbodies
tested, and the dangerously elevated mercury levels found are in SAR Tabs M-1,
M-2, and M-3.

More recent fish-tissue sampling for mercury has given no reason
to believe that the mercury contamination problem in fish-tissue has
gone away. There are, for example, 63 waters on the state's
Department of Health list of waters with Fish Consumption
Advisories due to mercury with recommendations of limited or no
consumption.

(Pl. Stmt. of Facts, doc. 60 at 36-37)

From the evidence before the Court, it appears that Defendants did have

data available showing the existence of mercury in Florida waters, but it is not

clear that Defendants acted outside the law in following certain parameters to

determine which waters would be included on the 303(d) list and which would be

approved.  Appendix I of the Decision Document lists waters added by the EPA

to Florida's 2002 list, showing that the EPA did draw a distinction between all

mercury-impaired waters and those mercury-impaired waters that do not

currently meet attainable water quality standards.  This distinction was made by

reviewing FDEP's data collection and assessment methods, undertaking its own analysis where necessary, and comparing FDEP's methodology to the guidance provided by the EPA.  The Court finds that EPA's decisions as to these waters were not arbitrary and capricious, and summary judgment is granted in favor of Defendants on this count.

## Count II

In Count II, Plaintiffs allege that the EPA was arbitrary and capricious in approving Florida's low priority for mercury-impaired waters.  Defendants, in contrast, argue that the EPA is not required to approve or disapprove the order in which states place their impaired waters.[12]  Section 303(d)(1)(A) of the CWA directs states to establish a priority ranking for impaired waters, "taking into account the severity of the pollution and the uses to be made of such waters." 40 C.F.R. § 130.7(b)(4) adopts this directive, requiring Florida to include in its list

> a priority ranking for all listed water quality-limited segments still requiring TMDLs, taking into account the severity of the pollution and the uses to be made of such waters and shall identify the pollutants causing or expected to cause violations of the applicable water quality standards. The priority ranking shall specifically include the identification of waters targeted for TMDL development in the next two years.

CWA section 303(d)(2) requires states to submit for approval a list of "the waters identified and the loads established."  No requirement is present that EPA approve the rankings.  Importantly, in its Decision Document, while the EPA

---

[12]  The Court finds no procedural bar to Plaintiffs' ability to raise this issue, contrary to Defendants' argument.

specifically approves or disapproves FDEP's decision to list, not list, or delist

waters, the section discussing prioritization does not "approve" or "disapprove"

FDEP's ranking; it merely concludes that Florida did, in fact, rank its waters and

set a TMDL schedule accordingly.

Because there is no requirement that the EPA actually approve or

disapprove of a state's priority rankings, the Court finds that Defendants have

met their burden of showing the absence of a genuine issue of material fact on

this matter, and summary judgment is granted in favor of Defendants as to Count

II.

## **Count III**

In Count III, Plaintiffs allege that the EPA's approval of Florida's delisting

of 64 waterbody/pollutant combinations[13] violates the CWA.  As in Count I, there

seems to be some disagreement between the parties as to exactly how many

waters are involved.  Plaintiffs cite 63 combinations in their amended complaint,

but a review of the referenced attachments shows a total of 64 combinations.

This total is broken down into three categories by Plaintiffs: 38[14] combinations

that exceeded applicable water quality standards at least once in the last 7.5

years; 7 that have "natural conditions"; and 19 that have high levels of nutrients.

Both sides cite to an EPA guidance document in the supplemental record

---

[13] Each "waterbody/pollutant combination" is listed separately, meaning, for example, that if a waterbody is found to have three pollutants, then that water can be listed three times.

[14] Plaintiffs' amended complaint refers to 28 combinations; the Court assumes this to be a typographical error.

setting out the two reasons a water may be delisted: 1) if that waterbody is meeting all applicable water quality standards or is expected to meet these standards in a reasonable timeframe as the result of required pollution controls; or 2) if, upon reexamination, the original basis for listing is determined to be inaccurate.  (SAR Tab G at 7, 11)  Plaintiffs argue that the delisted waters and combinations do not fall within either of these categories.

Exceedances

Plaintiffs contest EPA's approval of the delisting of 38 combinations that have demonstrated exceedances of maximum levels at least once within the last 7.5 years.  According to Florida Administrative Code section 62-302.530, Appendix M, particular parameters exist for which a maximum level is not to be exceeded at any time.  To do so constitutes pollution.  *Fla. Admin. Code* r. 62-302.500(2)(e).  Plaintiffs emphasize that the phrase "at any time" means that even one exceedance should result in EPA's refusal to delist those combinations.

Section 403.021(11) of the Florida Statutes states:

It is the intent of the Legislature that water quality standards be reasonably established and applied to take into account the variability occurring in nature. The department shall recognize the statistical variability inherent in sampling and testing procedures that are used to express water quality standards. The department shall also recognize that some deviations from water quality standards occur as the result of natural background conditions. The department shall not consider deviations from water quality standards to be violations when the discharger can demonstrate that the deviations would occur in the absence of any human-induced discharges or alterations to the water body.

The EPA's Decision Document recognized the futility of attempting to

maintain a flawless environment: "[P]erfect assessment of attainment for a 'not to be exceeded' standard assumes a monitoring design that continuously measures the criterion at all points in the waterbody."  (AR 2.4 at 20)  Because no such system is  in place in <u>any</u> state, the use of statistical sampling is required, which necessarily introduces variability and uncertainty into the data analysis, whether due to user error or natural variations in the water.  Thus, probabilistic modeling in "not to be exceeded" criteria "does not, barring unusual circumstances, allow a single sample to determine whether a waterbody is impaired."  (AR 2.4 at 21)

The EPA did not rely on statistics alone in analyzing FDEP's data; it also considered a number of factors such as the emergence of trends (more recent data rendering earlier data suspect); magnitude and frequency of exceedance; pollutant levels during critical conditions; biological monitoring, and more.  (AR 2.4 at 21)  The Court finds this "totality" approach a reasonable one that allows for statistical variations in different waters.  The EPA committed no error in approving the delisting of these 38 waters.

<u>Natural Conditions</u>

The FAC defines "natural" to mean "the condition of waters in the absence of man-induced alterations based on the best scientific information available to the Department," *Fla. Admin. Code* r. 62-302.200, and directs that FDEP "shall not strive to abate natural conditions." *Fla. Admin. Code* r. 62-302.300(15).  In particular, Plaintiffs claim that 7 waters with naturally-occurring low dissolved oxygen levels were improperly delisted.  These waters—springs and blackwater

streams—are different in character from other waters in Florida.  Specifically,

springs are low in dissolved oxygen levels until conditions for reaeration occur.

Blackwater streams, with their warm temperatures and darkly-stained waters,

have naturally high levels of organic material and low levels of dissolved oxygen.

The EPA reviewed all information submitted by FDEP and reasonably

determined that the oxygen levels of these specific waters are naturally below

those levels generally applicable to other Florida waters.  No error was made in

delisting these 7 waters.

Nutrients

Finally, Plaintiffs claim that 19 waters containing elevated nutrient levels

were improperly delisted and that the EPA simply accepted FDEP's rationale for

doing so without questioning either method or result.  Florida Administrative

Code section 62-302.530(48)(b) provides that "[i]n no case shall nutrient

concentrations of a body of water be altered so as to cause an imbalance in

natural populations of aquatic flora or fauna."  In interpreting this narrative

criterion,[15] FDEP uses trophic state indices; annual mean chlorophyll *a* values;

algal blooms; excessive macrophyte growth; decrease in seagrass distribution;

and oxygen swings.  *Fla. Admin. Code* r. 62-303.350(1).  A water is listed as

impaired if a 50% increase in nutrient levels (chlorophyll *a*) over historical values

is observed in conjunction with the consideration of site-specific observations.

---

[15] "Narrative criteria" typically describe a condition which must be met for the water to meet applicable standards, while "numeric criteria" typically establish a maximum range or level of a pollutant which can be present and still enable the water to attain applicable standards.

(AR 2.4 at 34).  *See also Fla. Admin. Code* rr. 62-303.353 and 62-303.351(2).

In examining FDEP's methodology, the EPA acknowledged that "[e]stablishing [nutrient level] thresholds that identify WQLS's statewide is a very difficult task given the varying natural interactions of the nutrient cycle in any given waterbody."  (AR 2.4 at 34)  It found that FDEP's system was a reasonable one that accounted for the varying natural interactions of the nutrient cycle.  It recognized that the nutrient levels identified "can serve as a 'backstop' so that known water quality limited segments will not be overlooked due to lack of historical data."  (AR 2.4 at 34)

The EPA also examined in detail the trophic state index (TSI) used by FDEP and pronounced it

> a good, site specific method for identifying waterbodies which are
> not attaining the State's water quality standard for nutrients. In
> addition, similar to the use of chlorophyll *a* data to apply the narrative standard discussed ab
> a good alternative in the absence of site specific historical data because these
> scores provide a positive threshold for likely environments where an imbalance of
> flora or fauna may exist.

(AR 2.4 at  35)  Overall, the EPA concluded that FDEP's application of narrative criteria was consistent with its approved water quality standards for nutrients, and the Court finds no error in this judgment.  The EPA thoroughly reviewed FDEP's rationale for delisting all waters referred to in Count III and found it to be analytically sound and supported by the data.  EPA's approval was not arbitrary or capricious, and summary judgment is granted in favor of Defendants on this count.

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.      Defendants' motion for summary judgment (doc. 76) is hereby

*granted*.

2.      Plaintiffs' motion for summary judgment (doc. 58) is hereby *denied*.

3.      Summary judgment is entered in favor of Defendants as to all

counts.

4.      Plaintiffs' motion to supplement the administrative record (doc. 56)

is granted in part as to Tabs A, B, C, E, F, G, H, I, L, M, N, O, and

U.  The remainder of the motion to supplement is denied.

**DONE AND ORDERED** in chambers this <u>thirty-first</u> day of May, 2005.

*s/ Stephan P. Mickle*
Stephan P. Mickle
United States District Judge

/pao